**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| J.R. SIMPLOT COMPANY; SIMPLOT PHOSPHATES LLC, fka SF PHOSPHATES LIMITED COMPANY; and SIMPLOT PIPELINE LLC, fka SF PIPELINE LIMITED COMPANY,<br><br>    **Plaintiffs,**<br><br>vs.<br><br>CHEVRON PIPE LINE COMPANY; CHEVRON CHEMICAL COMPANY; and CHEVRON U.S.A. INC.,<br><br>    **Defendants.**<br><br>────────────────────<br><br>CHEVRON PIPE LINE COMPANY; CHEVRON CHEMICAL COMPANY, a division of CHEVRON U.S.A. INC.; and CHEVRON U.S.A. INC.,<br><br>    **Counterclaimants,**<br><br>vs.<br><br>J.R. SIMPLOT COMPANY; SIMPLOT PHOSPHATES LLC, fka SF PHOSPHATES LIMITED COMPANY; and SIMPLOT PIPELINE LLC, fka SF PIPELINE LIMITED COMPANY,<br><br>    **Counterdefendants.** | **MEMORANDUM DECISION AND ORDER**<br><br><br>**Case No.  2:04CV00624DAK** |

This matter is before the court on several motions: Plaintiffs' Motion for Partial Summary Judgment; Defendants / Counterclaimants' Chevron Pipe Line Company, Chevron Chemical Company, a division of Chevron U.S.A., Inc. And Chevron U.S.A.'s ("Chevron"): (1) Motion for Summary Judgment as to the Complaint and First and Second Claims for Relief in the Amended Counterclaim; and (2) Motion for Partial Summary Judgment as to the Third Claim for Relief in the Amended Counterclaim ("Chevron's Motion for Summary Judgment"); and Plaintiffs' Motion for Summary Judgment on Chevron's Counterclaims. The court held a hearing on the motions on August 3, 2006. At the hearing, Scott Savage and Stephen Waldron represented Chevron. Peter Billings, Matthew Hutchinson and William Adams represented Plaintiffs and Counterdefendants J. R. Simplot Company, Simplot Phosphates LLC, fka SF Phosphates Limited Company, and Simplot Pipeline, LLC, fka SF Pipeline Limited Company ("SF Plaintiffs"). Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties. Since taking the motions under advisement, the court has further considered the law and facts relating to the motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

This suit pertains to, in essence, the cost of the joint defense mounted by Chevron and the SF Plaintiffs in connection with the litigation styled *Ashley Creek Phosphate Co. v. Chevron Corp., et al.,* Case No. 01-4017, 01-4031 and related litigation (the "Ashley Creek Litigation"). *See Ashley Creek Phosphate Co. v. Chevron*, 129 F. Supp. 2d 1299 (D. Utah 2000); *Ashley*

2

*Creek Phosphate Co. v. Chevron USA, Inc.,* 315 F.3d 1245 (10th Cir. 2003) *cert. denied*, *Ashley*

*Creek Phosphate Co. v. Chevron USA, Inc.,* 540 U.S. 820 (U.S. Oct. 6, 2003).

## A.  BACKGROUND REGARDING THE ASHLEY CREEK LITIGATION

In the Ashley Creek Litigation, Ashley Creek Phosphate Company ("Ashley Creek")

sought to use an existing pipeline to carry phosphate, used primarily in the manufacture of

phosphate fertilizer, from fields in Vernal, Utah, to a rail junction in Rock Springs, Wyoming

(the "Pipeline").  The SF Plaintiffs purchased the phosphate fields from Chevron and the State of

Utah in 1992.  The SF Plaintiffs also purchased from Chevron in 1992 all of Chevron's

phosphate mining and fertilizer business.  Ashley Creek purchased only the right to mine the

State's holdings in 1974.  In the Ashley Creek Litigation, Ashley Creek maintained that the

Pipeline was the only way to transport the phosphate from Vernal to the beneficiation plant to

create phosphate concentrate because: (1) easements for another pipeline would not be issued by

the federal government due to the environmental sensitivity and impact on the land, and (2) the

State of Utah would no longer issue overweight trucking permits for transportation by truck due

to the damage such trucking caused to the state roads (which is the factor that led Chevron to

construct the pipeline originally).

Chevron owned and controlled the Pipeline at the time it began operation in 1986.

Chevron obtained the necessary permits by assuring the federal government that the Pipeline

would be operated as a common carrier.  However, Chevron failed to publish a tariff until

ordered to do so by the Interstate Commerce Commission ("ICC") in 1989, acting in response to

a complaint filed by Ashley Creek.

Once Chevron published a tariff, Ashley Creek filed the Ashley Creek Litigation,

claiming, among other things, that the tariff violated the essential facilities doctrine of the Sherman Antitrust Act.  This court referred the question of the reasonableness of the Chevron's tariff to the ICC (the "ICC Action").  On April 17, 1992, while the ICC action was pending, Chevron sold its entire interest in the Pipeline, phosphate fields and plants to the SF Plaintiffs, who were joined as defendants in the Ashley Creek Litigation.

In 1996, the Surface Transportation Board ("STB") (successor to the ICC) ruled that Chevron's tariff was unreasonable at many shipping volumes.  Specifically, the 1996 STB Decision set forth a formula enabling the SF Plaintiffs, as the current owners of the Pipeline, to recover the cost of constructing the Pipeline and operating the Pipeline, plus a reasonable rate of return.  The formula allows a flat rate per ton, as opposed to an accelerated rate of depreciation or a flat rate per year.  For this reason, it is impossible to determine whether the tariff "over-recovers" until the total volume of phosphate shipped during the life of the Pipeline is known or assumed.  Once the total volume is known or assumed, the depreciation per ton can be determined and a calculation made of a specific amount recovered for each month, depending on that month's known or assumed volume.  For purposes of the 1996 Decision, the STB applied the formula to two different hypothetical sets of volumes and concluded that the tariff over-recovered, that is, was unreasonable, at many hypothetical volumes.

After the STB issued its decision, the SF Plaintiffs moved to dismiss the Ashley Creek Litigation on the grounds that, assuming Ashley Creek shipped its projected quantities, there would be no over-recovery during the 14-year period that the SF Plaintiffs owned the Pipeline. The District Court denied the motion, primarily on the grounds that a 20-year period must be utilized.

4

The SF Plaintiffs then published a new tariff, effective January 1, 1999, which the SF Plaintiffs claimed resulted in a significant net under-collection over the Pipeline's 20-year life. After issuance of the new tariff, the SF Plaintiffs sought summary judgment on all of Ashley Creek's claims.  This court granted summary judgment in favor of the SF Plaintiffs, concluding that (1) Ashley Creek lacked standing to bring its antitrust claims; and (2) in the alternative, the tariffs announced by Chevron and SF for use of the pipeline were reasonable.  Ashley Creek appealed claiming this court erred in granting summary judgment in favor of Chevron and the SF Plaintiffs on the antitrust claims and in refusing to dismiss Chevron's and the SF Plaintiffs' state-law counterclaims with prejudice.  The Tenth Circuit affirmed the dismissal of Ashley Creek's antitrust claims for lack of standing.  The Tenth Circuit did not address the court's alternate conclusion that the tariffs were reasonable and offered no opinion on that question.  On Chevron and the SF Plaintiffs' state law counterclaims, the Tenth Circuit dismissed the appeal in part, reversed in part and remanded for further proceedings.  This court resolved all remaining issues and closed the Ashley Creek Litigation on April 7, 2003.

## B.  BACKGROUND REGARDING THE PRESENT MOTIONS

### 1.  The Sale Agreements

When the SF Plaintiffs acquired the Pipeline and phosphate operation from Chevron, the parties entered into two Asset Sale Agreements ("Plant Agreement" and "Pipeline Agreement") dated November 4, 1991, ("Sale Agreements").  The Agreements contained defense, indemnification and warranty provisions.

### The General Indemnification Provisions

Under the Sale Agreements, Sections 12.2.1 of the Plant Agreement and 11.2.1 of the

Pipeline Agreement are referred to collectively as the General Indemnity Provisions by the

parties.  Section 11.2.1 of the Pipeline Agreement provides:

> 11.2.1  <u>Indemnification by Seller</u>.  Seller shall indemnify, defend and hold Purchaser, and
> their Affiliates, and their officers, directors, shareholders and employees,
> harmless from and against all claims, suits, damages, losses, expenses, costs,
> obligations, liabilities, recoveries and deficiencies, including interest, penalties
> and attorneys' fees, that they shall incur or suffer, which arise or result from (a)
> any and all liabilities and obligations attributed to the operation or ownership of
> the Assets or the Pipeline System prior to the Closing Date, which liabilities or
> obligations are not assumed by the Purchaser under the terms of this Agreement;
> (b) the breach of, or failure of Seller to perform any representation, warranty,
> covenant or agreement given or made by Seller herein, or in any writing furnished
> or to be furnished by Seller herein, or in any writing furnished or to be furnished
> by Seller under this Agreement; (c) any suit, action arbitration, or legal,
> administrative, governmental or other proceeding that relates to the ownership or
> use of the Assets or the Pipeline System prior to the Closing or any default with
> respect to any order, writ, injunction or decree of any federal, state, local, tribal or
> foreign court, department, agency or instrumentality which is attributed to the
> operation of the Assets or the Pipeline System prior to the Closing; . . . .

(11/4/1991, Pipeline Agreement, at § 11.2.1)[1].

### *The Ashley Litigation Provisions*

The Pipeline and Plant Agreements also contain provisions known as the Ashley

Litigation Provision.  The Pipeline Agreement provides:

> 2.6.1  <u>Litigation</u>.  Seller or its Affiliates will retain responsibility for and control over
> the defense of Seller's or Seller's Affiliates involvement in the litigation in,
> <u>Ashley Creek Phosphate Co. v. Chevron Pipe Line Co., et. al.</u>, ICC Docket No.
> 40131 (Sub.-No. 1) (the "ICC Case") and <u>Ashley Creek Phosphate Co. v.</u>
> <u>Chevron U.S.A., Inc.</u>, 89-C-554-S (D.Utah, filed June, 1989), and Seller shall be
> responsible and liable for all penalties, damages, and costs granted in such
> litigation or resulting from settling such cases.  Purchaser shall assume the
> responsibility and cost of prospective compliance with the tariff when set in the

---

[1]Section 12.2.1 of the Plant Agreement contains virtually identical defense and indemnification language made between Chevron Chemical and Chevron U.S.A., as Seller and the SF Plaintiffs, as Purchasers.

ICC Case and any mandatory prospective compliance orders granted in either case. Seller shall, in handling such litigation, keep Purchaser fully informed on the status of the cases and, consult with Purchaser concerning defense strategy, and allow Purchaser to make recommendations. Seller shall make decisions concerning the litigation and pursue the litigation vigorously and in due consideration of the economic viability of the mine and fertilizer plant as if Seller was still the owner of the mine and fertilizer plant. Seller or its Affiliates will not settle either case without written permission of Purchaser, which shall not unreasonably be withheld.

(11/4/91 Pipeline Agreement, at § 2.6.1).[2]

### *The Warranty Provisions*

The Sale Agreements also contain warranty provisions. Article V of the Pipeline

Agreement provides:

Seller hereby represents and warrants to Purchaser that as of the date of this Agreement, and as of the Closing Date, the following facts are, and shall be, true.

* * *

5.11   <u>Compliance with Laws.</u>  Except for matters set forth in Schedule 5.11, the Pipeline System is being operated in material compliance with all laws and regulations applicable to such operations, and is in material compliance with all orders, writs, injunctions, decrees, judgments, rulings, laws, rules and regulations of any court, governmental or tribal authority or arbitrator.

Schedule 5.1 of the Pipeline Agreement states:

<u>Compliance with laws.</u>  Instances where the Pipeline System is not being operated in material compliance with all laws and regulations applicable to such operations, or is not in material compliance with all orders, writs, injunctions, decrees, judgments, rulings, laws, rules and regulations of any court, governmental or trial authority or arbitrator:   None.

---

[2]The Ashley Litigation Provision of the Plant Agreement, Section 2.8.2, is virtually identical to Section 2.6.1 of the Pipeline Agreement.

(11/4/91, Pipeline Agreement, at §§ 5, 5.11, Schedule 5.1)[3].

### *The Integration Provision*

> 12.9 <u>Entire Agreement</u>.  This Agreement, including the Schedules and other writings referred to herein or delivered pursuant hereto, constitutes the entire agreement between Seller and Purchaser with respect to the subject matter hereof, and supersedes all prior oral or written agreements, commitments or understandings with respect thereto; provided that the Confidentiality Agreement dated January 10, 1991, shall remain in full force and effect until and unless terminated by the parties.  No amendment or waiver of the terms of this Agreement shall be binding on the parties unless in writing and signed by authorized representatives of both parties hereto.  Any waiver or any breach of any term or condition of this Agreement shall not operate as a waiver or any other breach of such term or condition or any other term or condition of this Agreement.  The headings used in this Agreement are for convenience of reference only and shall not be used to define the meaning of any provision.

(11/4/91, Pipeline Agreement, at § 12.9).[4]

## 2.  The Tolling Agreement

On April 16, 1998, the parties entered into an agreement (the "Tolling Agreement") whereby the SF Plaintiffs and Chevron acknowledged that the parties "may or do have claims for indemnification relating to the costs, fees and liabilities incurred or that may potentially be incurred as a result of actions taken by Ashley Creek . . . with respect to . . . (3) <u>Ashley Creek v. Chevron Corporation, et. al.</u>, Civil No. 89-C-0554-S and 2:96CV0340W."  4/16/1998 Tolling Agreement.  Chevron and the SF Plaintiffs agreed to "defer any litigation concerning their respective rights regarding any of the Ashley Creek Related Claims until after the resolution of

---

[3]Article 6, Sections 6.11, and Schedule 6.11 of the Plant Agreement are virtually identical to Article 5, Sections 5.1, 5.11 and Schedule 5.11 of the Pipeline Agreement.

[4]Section 13.9 of the Plant Agreement is virtually identical to Section 12.9 of the Pipeline Agreement.

Ashley Creek. . . ." *Id.* As part of the agreement, the parties agreed to "not assert any claim for indemnification for any of the Ashley Creek Related Claims against each other during the term of the Agreement . . . ." The Tolling Agreement was extended until October 2004.

As a result of the Tolling Agreement, the SF Plaintiffs waited until resolution of the Ashley Creek Litigation and then on July 6, 2004, filed suit against Chevron to resolve the issues tolled under the Tolling Agreement.

### 3. The Present Motions

The SF Plaintiffs seek partial summary judgment and request that the court enter an order finding that: (1) Chevron had a duty to defend and indemnify the SF Plaintiffs as of the date of Ashley Creek's Amended Complaint filed April 16, 1996; and (2) that Chevron is required to pay the fees and costs incurred by the SF Plaintiffs in defending against the Ashley Creek claims from April 16, 1996. The SF Plaintiffs request that the issue of the reasonableness and amount of fees and costs be resolved at a future date. The SF Plaintiffs also seek summary judgment as to Chevron's Amended Counterclaims.

Chevron seeks summary judgment: (1) as to the claims for relief in the Complaint filed by the SF Plaintiffs; (2) as to the first claim for declaratory relief and the second claim for claim preclusion and equitable estoppel in Chevron's Amended Counterclaim; and (3) partial summary judgment as the third claim for relief for breach of contract and indemnity in Chevron's Amended Counterclaim on the issue of liability. Chevron does not seek summary judgment as to the amount of damages at this time.

### STANDARD OF REVIEW

Summary judgment is proper if the evidence shows that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P 56(c) (2005);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986);

*Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  In

applying this standard, the court must construe all facts and reasonable inferences in the light

most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

475 U.S. 574, 587 (1986);  *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.

2002), cert. denied, 537 U.S. 816 (2002).  The court may consider only admissible evidence

when ruling on a motion for summary judgment.  *See World of Sleep, Inc. v. La-Z-Boy Chair*

*Co.,* 756 F.2d 1467, 1474 (10th Cir. 1985).

## DISCUSSION

The parties' main dispute with respect to Chevron's duty to defend and indemnify

involves the proper interpretation of the Sale Agreements' defense and indemnification

provisions.[5]

## I.     Ambiguity of the Sale Agreements

The SF Plaintiffs argue that when they purchased Chevron's phosphate pipeline and

related businesses in April 1992, Chevron agreed to indemnify, defend and hold the SF Plaintiffs

harmless from and against all "claims, suits, damages, losses, expenses, costs, obligations,

liabilities, recoveries and deficiencies, including interest, penalties and attorneys' fees" which

---

[5]Utah law governs the interpretation and application of the Sale Agreements.  Each
Agreement provides that "[t]his Agreement and the rights and obligations of the parties hereto
shall be governed by and construed in accordance with the laws of the state of Utah, without
regard to conflict of law. . . ." 11/4/91 Pipeline Agreement at § 12.8; 11/4/91 Plant Agreement, at
§ 13.8.

were "attributed to the operation or ownership of [the pipeline]" or which "relate[d] to the ownership or use of [the pipeline]" during the period it was owned by Chevron." *See* 11/4/91 Pipeline Agreement, at § 11.2.1; 11/4/91 Plant Agreement, at § 12.2.1.  The SF Plaintiffs also claim that Chevron agreed to defend and indemnify the SF Plaintiffs against any breach of Chevron's warranties. *See id*; 11/4/91, Pipeline Agreement, at § 5.11; 11/4/91, Plant Agreement, at § 2.8.2.  The SF Plaintiffs claim that when Ashley Creek joined the SF Plaintiffs in the Ashley Creek Litigation in April 1996, alleging that the pipeline tariffs were unlawful and excluding Ashley Creek from the market, Chevron had a duty to defend and indemnify the SF Plaintiffs based on the language of the General Indemnity Provisions in the Sale Agreements.

Chevron claims its duty to defend and indemnify was not triggered.  Chevron argues that it has no duty to defend or indemnify under the General Indemnity Provisions because the provisions do not apply to claims brought by Ashley Creek against the SF Plaintiffs in the Ashley Creek Litigation.  Chevron claims that the Ashley Litigation Provision was the parties' exclusive, specific agreement regarding anticipated claims by Ashley Creek, and it did not provide that Chevron had a duty to defend or indemnify the SF Plaintiffs.  Chevron claims that the parties negotiated a contract that clearly did not require Chevron to defend the SF Plaintiffs in any litigation Ashley Creek filed as a result of the transfer of the pipeline and phosphate business to the SF Plaintiffs.

Chevron also claims that the General Indemnity Provision did not trigger its duty to defend or indemnify the SF Plaintiffs in the Ashley Creek Litigation for several reasons. Chevron argues that because the SF Plaintiffs seek to relitigate issues that were fully litigated and decided in the Ashley Creek Litigation, specifically, the reasonableness of the tariff rates,

11

the SF Plaintiffs are estopped from doing so again.  Chevron claims that this court must look to extrinsic evidence to determine the duty to indemnify and defend.  Chevron argues that the SF Plaintiffs caused tariff unreasonableness, not Chevron.  Chevron also claims that Ashley Creek's claims against the SF Plaintiffs were sufficient for an antitrust suit, independent of Chevron's actions.  Chevron argues that it did not breach its Section 5.11 Warranty of the Pipeline Agreement.  Finally, Chevron claims that the SF Plaintiffs' actions increased the risk of Chevron's liability under the General Indemnity Provision, and thus discharged any duty Chevron may have had to indemnify or defend the SF Plaintiffs.

Because the parties have conflicting interpretations of these defense and indemnification provisions, this court must determine whether the language of the provisions is ambiguous, in that they could reasonably support both interpretations.  The court will look at the Ashley Litigation Provision and the General Indemnity Provisions independently and in turn.[6]

## A.    *Ambiguity of the Sale Agreement Provisions*

### 1.    The Role of Extrinsic Evidence

Chevron argues that the indemnification and defense provisions in the Sale Agreements are ambiguous, therefore this court should look to extrinsic evidence to determine the parties' intent.

A court's determination "[w]hether a contract term is ambiguous is a question of law . . ."

---

[6]The Ashley Litigation Provisions found in the Plant Agreement and Pipeline Agreement are virtually identical in language and meaning.  So too are the General Indemnity Provisions found in the Plant and Pipeline Agreements.  Therefore, this court will only review the language from the Pipeline Agreement for the sake of brevity.  The court's analysis applies to the Plant Agreement's provisions as well.

and if unambiguous, "a trial court may interpret the contract as a matter of law." *Sharon Steel Corp. v. Aetna Casualty and Surety Company, et. al.,* 931 P.2d 127, 134 (Utah 1997).  A court may find that "[a] contract provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms or other facial deficiencies." *Canopy Corp. v. Symantec Corp.,* 395 F. Supp. 2d 1103, 1107 (D. Utah 2005) (quoting *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991)).  Words used in a contract will be given their ordinary, plain or natural meaning unless the words have acquired a peculiar meaning or absurd consequences would result from doing so.  *See Caine v. Hagenbarth*, 106 P. 945 (UT 1910).

> In determining whether a contract is ambiguous the court is not bound to consider only the language of the contract. . . In *Ward* we specified the functional import of extrinsic evidence: If after considering such evidence the court determines that the interpretations contended for are reasonably supported by the language of the contract, then extrinsic evidence is admissible to clarify the ambiguous terms. Conversely, if after considering such evidence, the court determines that the language of the contract is not ambiguous, then the parties' intentions must be determined solely from the language of the contract.

*Peterson v. Sunrider Corp.,* 48 P.3d 918, 924 (Utah 2002) (quoting *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995)).  As directed by *Ward,* we look to the language of the contract.  *Id*.

## 2.     Ashley Litigation Provision[7]

Section 2.6.1 of the Pipeline Agreement's Ashley Litigation Provision provides:   2.6.1 Litigation.  Seller or its Affiliates will retain responsibility for and control over the defense of Seller's or Seller's Affiliates involvement in the litigation in, Ashley Creek

---

[7]For purposes of this order, the court examines the Ashley Litigation Provision from the Pipeline Agreement.  However, the same analysis applies to the Ashley Litigation Provision in the Plant Agreement.

Phosphate Co. v. Chevron Pipe Line Co., et. al., ICC Docket No. 40131 (Sub.-No. 1) (the "ICC Case") and Ashley Creek Phosphate Co. v. Chevron U.S.A., Inc., 89-C-554-S (D. Utah, filed June, 1989), and Seller shall be responsible and liable for all penalties, damages, and costs granted in such litigation or resulting from settling such cases. Purchaser shall assume the responsibility and cost of prospective compliance with the tariff when set in the ICC Case and any mandatory prospective compliance orders granted in either case.  Seller shall, in handling such litigation, keep Purchaser fully informed on the status of the cases and, consult with Purchaser concerning defense strategy, and allow Purchaser to make recommendations.  Seller shall make decisions concerning the litigation and pursue the litigation vigorously and in due consideration of the economic viability of the mine and fertilizer plant as if Seller was still the owner of the mine and fertilizer plant.  Seller or its Affiliates will not settle either case without written permission of Purchaser, which shall not unreasonably be withheld.

(11/4/91, Pipeline Agreement, at § 2.6.1).

The language of Section 2.6.1 states that the parties agreed that Seller (Chevron) would retain responsibility for and control over the defense of Seller's involvement in the Ashley Creek Litigation.  The court can find no mention of, or anticipation of the Purchaser (SF Plaintiffs) being brought into the Ashley Creek Litigation as a defendant.  The court also can find no reasonable anticipation that the SF Plaintiffs would assume the costs of their own defense if brought into the Ashley Creek Litigation as a defendant, as claimed by Chevron.  To the contrary, the provision clearly anticipates that the Seller will remain in control of the defense of the Ashley Creek Litigation to its conclusion:  Seller "shall make decisions concerning the litigation and pursue the litigation vigorously. . . [and] will not settle either case without written permission of Purchaser. . . ."  Id.  Purchaser's sole duty under the provision was to "assume responsibility and cost of prospective compliance with the tariff when set in the ICC Case and any mandatory prospective compliance orders granted in either case."  Id.

The court reviewed, but does not admit the offered extrinsic evidence and concludes the language in the Ashley Litigation Provision is not ambiguous as to the SF Plaintiffs.  *See*

*Peterson,* 48 P.3d at 924 (using *Ward* standard).  The provision can be reasonably read to only

pertain to the Ashley Creek Litigation prior to the SF Plaintiffs' inclusion as a defendant.  The

provision cannot, however, by its plain terms be reasonably read to mean that the SF Plaintiffs

must pay the cost of their own defense when read in light of the General Indemnity Provision, as

discussed more fully below.  This court finds the language of the Ashley Litigation Provision to

be unambiguous on its face.

>    **3.      General Indemnity Provision**[8]

We next turn to the Pipeline Agreement's General Indemnity Provision which provides:

>    11.2.1  <u>Indemnification by Seller</u>.  Seller shall indemnify, defend and hold Purchaser, and
>    their Affiliates, and their officers, directors, shareholders and employees,
>    harmless from and against all claims, suits, damages, losses, expenses, costs,
>    obligations, liabilities, recoveries and deficiencies, including interest, penalties
>    and attorneys' fees, that they shall incur or suffer, which arise or result from (a)
>    any and all liabilities and obligations attributed to the operation or ownership
>    of the Assets or the Pipeline System prior to the Closing Date, which liabilities or
>    obligations are not assumed by the Purchaser under the terms of this Agreement;
>    (b) the breach of, or failure of Seller to perform any representation, warranty,
>    covenant or agreement given or made by Seller herein, or in any writing furnished
>    or to be furnished by Seller herein, or in any writing furnished or to be furnished
>    by Seller under this Agreement; (c) any suit, action arbitration, or legal,
>    administrative, governmental or other proceeding that relates to the ownership or
>    use of the Assets or the Pipeline System prior to the Closing or any default with
>    respect to any order, writ, injunction or decree of any federal, state, local, tribal or
>    foreign court, department, agency or instrumentality which is attributed to the
>    operation of the Assets or the Pipeline System prior to the Closing. . . .

(11/4/1991, Pipeline Agreement, at § 11.2.1).

The parties agreed that Seller (Chevron) would indemnify and defend Purchaser (SF

---

[8]For purposes of this order, the court examined the General Indemnity Provision from the
Pipeline Agreement.  However, the same analysis applies to the General Indemnity Provision in
the Plant Agreement.

Plaintiffs) against "all claims [or] suits . . . which arise or result from . . . [or is] attributed to the operation or ownership of the Assets or the Pipeline System prior to the Closing Date . . . ." *Id.* (emphasis added).  The provision does not include any limitations or exclusions regarding particular claims or suits.  However, contract provisions should be read together so as not to be in conflict.  *See Big Cottonwood Tanner Ditch Co. v. Salt Lake City*, 740 P.2d 1357, 1359 (Utah Ct. App. 1987) (explaining that effort must first be made to reconcile the inconsistencies and only if inconsistent, do secondary rules of construction apply); *Colorado Milling & Elevator Co. v. Chicago, Rock Island & Pacific R.R.,* 382 F.2d 834, 837 (10th Cir. 1967) ("[W]here both specific and general provisions may be given reasonable effect, both are to be retained.").  Looking at the Sale Agreements as a whole, this court does not find any language which is capable of more than one reasonable interpretation due to uncertain meanings or missing terms, or other facial deficiencies.  *See Canopy Corp.*, 395 F. Supp. 2d at 1107.  Coupled with a review of the offered extrinsic evidence, the language in the General Indemnity Provision is not ambiguous.  *See Peterson,* 48 P.3d at 924 (using *Ward* standard).  Indemnity obligations must be clear and unequivocal and this court believes that the General Indemnity Provision is both clear and unequivocal.  *See Bishop v. GenTec Inc.*, 48 P.3d 218, 224-25 (Utah 2002);  *CIG Exploration, Inc. v. Hill*, 824 F. Supp. 1532, 1541-42 (D. Utah 1993) (applying Utah law).

The Ashley Litigation Provision did not address claims by Ashley Creek against the SF Plaintiffs which "arise or result from" Chevron's pre-Closing activities.  Moreover, there is nothing inconsistent between the provision requiring Chevron to defend itself as if it still owned the Pipeline and the provision requiring Chevron to defend the SF Plaintiffs for conduct occurring during the period of Chevron's ownership prior to the Closing-date resulting in

liability for the SF Plaintiffs or to defend the SF Plaintiffs for breaches of Chevron's warranties. Therefore, the catchall General Indemnity Provision covers the claims by Ashley Creek against the SF Plaintiffs, as long as the SF Plaintiffs can show that the Ashley Creek Litigation arose out of, resulted from or was attributed to Chevron's pre-Closing activities.

### 4.      Integration Provisions

The SF Plaintiffs claim that the integration clauses in Sections 12.9 and 13.9 of the Sale Agreements restrict this court from looking past the "four corners" of the documents to determine if there is any ambiguity, and only if the contract is ambiguous should the court look to extrinsic evidence.  *See Winegar*, 813 P.2d at 108 ("A court may only consider extrinsic evidence if, after careful consideration, the contract language is ambiguous or uncertain.").  The parties agreed that the Sale Agreements were the "entire agreement" and that they "supersedes all prior oral or written agreements."  *See* 11/4/91, Pipeline Agreement, § 12.9; Plant Agreement § 13.9.  "Where a contract is integrated, 'the parole evidence rule excludes evidence of terms in addition to those found in the agreement.'" *Lee v. Barnes*, 977 P.2d 550, 52 (Utah Ct. App. 1999) (quoting *Hall v. Process Instruments and Control*, 866 P.2d 604, 606 (Utah Ct. App. 1993), aff'd, 890 P.2d 1024 (Utah 1995)).  "'If a contract is unambiguous, the intentions of the parties must be determined [solely] from the words of the agreement.'"  *Shelter Mortgage Corp. v. Castle Mortgage Co., L.C.*, 117 Fed. Appx. 6, *10 (10th Cir. 2004) (quoting *Lee v. Barnes*, 977 P.2d at 552 (alterations in original));  *see also Wardley Corp. v. Meredity Corp.*, 93 Fed. Appx. 183, 185 (10th Cir. 2004).

Chevron attempts to avoid any responsibility to defend and indemnify under the Sale Agreements by claiming that under Utah law indemnity agreements are valid "only if the

contract language clearly and unequivocally expresses the parties' intent to indemnify one another."  *Ervin v. Lowe's Cos., Inc.,* 128 P.3d 11, 15 (Utah Ct. App. 2005);  *Bishop*, 48 P.3d at 224 ("we will not infer an intention to indemnify against other kinds of liability, including strict liability, where such intention is not clearly expressed").  This court disagrees with the assertion that Chevron is relieved of any duty to indemnify or defend the SF Plaintiffs due to ambiguity in the contract terms.  "[A] contract provision is not necessarily ambiguous just because one party gives that provision a different meaning than another party does.  To demonstrate ambiguity, the contrary positions of the parties must each be tenable."  *Novell, Inc. v. Canopy Group*, 92 P.3d 768, 774 (Utah Ct. App. 2004).  Moreover, the "proffered alternative interpretation 'must be plausible and reasonable in light of the language used . . . the alternative rendition 'must be based upon the usual and natural meaning of the language used and may not be the result of a forced or strained construction.'"  *Saleh v. Farmers Insur. Exch.*,133 P.3d 428, 433 (Utah 2006) (quoting *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998) and *Home Sav. & Loan v. Aetna Cas. & Sur. Co.,* 817 P.2d 341, 367 (Utah Ct. App. 1991)).  "Although [the Utah Supreme Court] has left some discretion to courts in determining whether ambiguity exists, at minimum one universal standard applies to this determination: words and phrases do not qualify as ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests."  *Id*.

This court must construe the language of the Sale Agreements and apply an ordinary meaning to the disputed provisions.  This court refuses to imply a broad meaning for the Ashley Litigation Provision, especially when that meaning would be in conflict with the express purpose of the General Indemnity Provision.  This court finds that an ordinary meaning of the language in

the Ashley Litigation Provision, as used in context and read with the General Indemnity

Provision, is excluding any reference to the SF Plaintiffs as defendants in the Ashley Creek

Litigation.

Lacking ambiguity, this court will not admit extrinsic evidence to allow argument as to

what the parties may or may not have meant in the contract.  *See Winegar*, 813 P.2d at 108;

*Bakowski v. Mt. States Steel, Inc.*, 52 P.3d 1179, 1184 (Utah 2002);  *Webbank v. American*

*General Annuity Service*, 54 P.3d 1139, 1146 (Utah 2002).  Chevron has not identified any

ambiguity within the four corners of the Sale Agreements.  The Ashley Litigation Provision

clearly omits any discussion of the SF Plaintiffs as a defendant in the Ashley Creek Litigation.

The General Indemnity Provision unambiguously is the catchall provision for "all" other suits or

claims arising from pre-Closing activity.  The court finds the provision unambiguous.

As directed in *Ward*, this court considered whether the parties' arguments regarding the

interpretation of the provisions are reasonably supported by the actual language of the Sale

Agreements and concludes they are not.  In this case, sophisticated parties with equal bargaining

power negotiated a set of clear and plain Sale Agreements.  This court agrees that it may not

admit extrinsic evidence to divine the parties' intentions based on the integration clauses,

coupled with the unambiguous language of the Ashley Litigation Provision and the General

Indemnity Provisions found in Sale Agreements.  *See Peterson,* 48 P.3d at 924 (quoting *Ward*,

907 P.2d at 268).

## II.     Chevron's Duties Under the Plain Language of the Sale Agreements

If Chevron has a duty to defend and indemnify, it arises from the General Indemnity

Provisions of the Sale Agreements.  However, in order for Chevron's duty to defend and

indemnify to have been triggered, Ashley Creek's claims in the Ashley Creek Litigation against the SF Plaintiffs must arise from, relate to or be attributed to Chevron's pre-Closing conduct. The General Indemnity Provision imposed two specific duties on Chevron, a duty to defend and a duty to indemnify. Each duty is addressed independently.

**A.      *Chevron's Duties To Defend Under the General Indemnity Provision***

Under Utah law, to "engage in a duty-to-defend analysis, we focus on two documents: the insurance policy and the complaint. 'An insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations of the complaint.'" *Benjamin v. Amica Mutual Ins. Co.,* 2006 UT 37, ¶15, 555 Utah Adv. Rep. 8, *3 (Utah July 7, 2006) (quoting *Fire Ins. Exchange v. Estate of Therkelsen*, 27 P.3d 555, 2001 UT 48, ¶ 21 (UT 2001)); *see also Nova Cas. Co. v. Able Constr. Inc.*, 983 P.2d 575, 578, 1999 UT 69, ¶ 8 (UT 1999).[9]

In *Benjamin*, the Utah Supreme Court began its duty to defend analysis with the four corners of the contract, "because the duty to defend is contractual." *Id.* After looking at the contract language, the Court narrowed its inquiry to whether the plaintiffs alleged claims that were covered by the terms of the contract. *Id.* at *4. In *Benjamin*, it was factually unclear whether the alleged injury was covered under the terms of the policy. *Id.* "Where factual questions render coverage uncertain . . . the insurer must defend until those uncertainties can be resolved against coverage. When in doubt defend." *Id.* Court went on to explain that "[w]here an insurance policy obligates an insurer to defend claims . . . the insurer is obligated to do so until those claims are either dismissed or otherwise resolved in a manner inconsistent with

_____

[9]*Therkelsen* "cited to an alternative formulation of this rule: 'The test is whether the complaint alleges a risk within the coverage of the policy.'" *Id.* at *3.

coverage." *Id.* at *5.  The Court held that the insurer was obligated to defend the insured.  *Id.*

Chevron argues that *Benjamin* is inapplicable because the case at bar is not an insurance coverage case and the SF Plaintiffs were not purchasing an insurance policy.  This court disagrees and finds *Benjamin* instructive.[10]  The parties negotiated risk allocation in the General Indemnity Provision, which, in this case operated as a type of insurance policy for the SF Plaintiffs.  "[I]nsurance policies should be construed liberally in favor of the insured . . . so as to promote and not defeat the purpose of insurance."  *Benjamin,* 555 Utah Adv. Rep. 8, 2006 UT 37, ¶ 24 (citations omitted).  Chevron must comply with language in the contract it negotiated and eventually agreed to, regardless of the negotiations leading up to the final agreement.

### 1.    Did Ashley Creek's allegations against the SF Plaintiffs arise from, relate to, or can they be attributed to Chevron's pre-Closing activity?

Chevron argues that Ashley Creek's pleadings did not trigger the General Indemnity Provision's duty to defend because neither the Amended nor Second Amended Complaint made allegations against the SF Plaintiffs specifically concerning the alleged over-collections under Chevron's tariffs.  Chevron claims that Ashley Creek failed to affirmatively allege a link between its SF Plaintiffs-specific allegations and the Chevron over-collection tariff allegations.  As a result, it argues the allegations made against the SF Plaintiffs are not "related to, arise from, or attributed to" Chevron's pre-Closing actions.

The SF Plaintiffs claim that if any of the allegations in the complaints support the

---

[10]Although Utah has not applied this same standard in construing duty to defend provisions to commercial agreements other jurisdictions have.  *See, e.g., Pancakes of Hawaii v. Pomare Properties*, 944 P.2d 83, 89 (Hawaii Ct. App. 1997) (applying procedure used in insurance context to duty to defend based on indemnity context in commercial context).

elements of Ashley Creek's claims against the SF Plaintiffs, Chevron's duty to defend the SF Plaintiffs applies.

The role "of the trial court in determining the duty to defend under the terms of the [] agreement is simply to determine whether any of the allegations in the complaint potentially include conduct that arose under the [] agreement." *Pancakes of Hawaii*, 944 P.2d at 91.

Ashley Creek alleged in its complaints that the tariffs were unreasonable and exclusionary. *See* Amended Compl. ¶¶ 13, 44, 91, 111, 143, 157, 165; Second Amended Complaint ¶¶ 13, 15, 49, 84, 98, 141(k), 151. Ashley Creek relied on each of these allegations to support every claim against the SF Plaintiffs. *See* Amended Complaint, Counts I-IX; Second Amended Complaint, Counts I-XII. Ashley Creek asked the district court to award damages against the SF Plaintiffs for both Chevron's and the SF Plaintiffs' ownership. *See id.* For example, in Count I, Ashley Creek alleged that beginning in 1986, unlawful monopoly activity began and it sought judgment against the SF Plaintiffs in Count I for both Chevron's and the SF Plaintiffs' alleged conduct. Ashley Creek repeated this allegation throughout the Amended and Second Amended Complaint. It appears clear that Ashley Creek based its allegations and claims for relief against the SF Plaintiffs, at least in part based upon Chevron's pre-Closing conduct.[11] In light of *Benjamin*, this court finds that Ashley Creek relied sufficiently on Chevron's pre-Closing actions to invoke Chevron's duty to defend in the Sale Agreements' General Indemnity Provisions. In reaching this conclusion, the court finds no genuine issue as to any material fact

---

[11]Even the Tenth Circuit recognized that Ashley Creek "never distinguished between the actions of Chevron and SF before the district court and does not do so on appeal." *Ashley Creek Phosphates Co. v. Chevron et al.,* 315 F.3d at 1256 n.8.

precluding summary judgment.

### a.      Scope of Chevron's Duty to Defend

The SF Plaintiffs claim that, based on the general rule that an insurer's duty to defend is

broader than its duty to indemnify, Chevron must defend in the Ashley Creek Litigation even

though  Chevron was ultimately not liable to indemnify the SF Plaintiffs.[12]  *See Therkelsen*, 27

---

[12]Chevron argues that because this case does not construe an insurance policy, but defense and indemnity provisions in commercial agreements, this court should not rely upon insurance case law.  Utah has not addressed this issue, but other courts have.

> We can discern no logical reason why the duty to defend based on indemnity contracts should not follow the same philosophy used in the insurance context . . . The duty to defend, to have any effect at all, must be determined when the complaint is filed. Otherwise, an indemnitor can simply refuse to tender a defense whenever a suit alleges claims that are not covered by the indemnity provision.  This kind of result would defeat the purpose of a duty to defend provision by forcing the indemnitee to shoulder the entire cost of defending suits that raise the potential for indemnification . . . the procedure used to determine the duty to defend based on indemnity contracts can follow the same procedure used in the insurance context . . . this is the only equitable interpretation that gives life to non-insurance indemnity clauses and prevents indemnitors from benumbing the duty to defend until after a case has been litigated.

> A number of jurisdictions have freely imported the common law reasoning from insurance cases to contractual indemnity cases.  *See, e.g., Hillman v. Leland E. Burns, Inc.*, 209 Cal. App. 3d 860, 257, Cal.Rptr. 535 (Cal.Ct.App. 1989) (in dispute between contractor and architect, failing to determine duty to defend when claim is filed would lead to absurd result); *Herson v. New Boston Garden Corp.*, 40 Mass. App. Ct. 779, 667 N.E.2d 907 (duty to defend based on contractual indemnity provision broader than duty to indemnify), *review denied,* 423 Mass. 1108, 671 N.E.2d 951 (1996); *W. Lyman Case & Co. v. National City Corp.*, 76 Ohio St.3d 345, 667 N.E.2d 978 (1996) (using insurance case law to apply broad duty to defend in dispute between corporation and seller of stock); *Knipschield v. C-J Recreation, Inc.*, 74 Wash. App. 212, 872 P.2d 1102 (1994) (duty to defend in tort cases arises at the time of tender of defense).

*Pancakes of Hawaii v. Pomare Properties*, 944 P.2d at 89.  This court finds their reasoning persuasive.

P.3d at 560; *Sharon Steel*, 931 P.2d at 133. The scope of the duty to defend "depends upon the language in the [contract] which defines the duty." *H.E. Davis & Sons, Inc. v. North Pacific Ins. Co.*, 248 F. Supp. 2d 1079, 1087 (D. Utah 2002).

The SF Plaintiffs argue that this court must look to the facts alleged in the complaint in the Ashley Creek Litigation and decide whether they give rise to the potential of liability under the General Indemnity Provision to determine whether Chevron's duty to defend has been invoked.

Chevron argues that Utah law on the duty to defend and indemnify changed with the issuance of *Therkelsen*. *See Therkelsen*, 27 P.3d at 560.

### b.     *Fire Insurance Exchange v. Estate of Therkelsen*

This court reviewed *Therkelsen* and finds that it is both factually and legally distinguishable from this matter.  In *Therkelsen*, the Utah Supreme Court explained "[a]s a general rule, an insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations in the complaint." *Id*.  And this rule is "based on the proposition that 'an insurer's duty to defend is broader than its duty to indemnify.'" *Id*. (quoting *Sharon Steel*, 931 P.2d at 133).  But "the accuracy of this proposition hinges on the particular contractual terms of the insurance policy defining the scope of the duty to defend and the duty to indemnify." *Id*.   In *Therkelsen*, the court explained, for example, a homeowner's policy indemnification provision might promise to defend against fraudulent or groundless claims. *Id*. In such a circumstance, "[t]he duty to indemnify [would be] determined by the underlying facts of the case, [while] the duty to defend [would be] controlled by the allegations in the complaint against the insured.  In this sense, the insurer's duty to defend is broader than its duty to

indemnify . . . in such a case it would be error for the trial court to consider extrinsic evidence, as it is wholly irrelevant to the issue of whether the insurer has a duty to defend its insured." *Id.* (quotations omitted) (alterations in original). The *Therkelsen* court reviewed whether the insurer had a duty to indemnify the insured, but did not have sufficient record to determine whether allowing extrinsic evidence was proper in that case. *Therkelsen*, 27 P.3d at 560.

The General Indemnity Provision here is similar to the homeowner's policy discussed in *Therkelsen* because the parties agreed that Chevron would indemnify the SF Plaintiffs against "all" claims. Therefore, based on the language of the contract and *Therkelsen* "it would be error for [this] court to consider extrinsic evidence as it is wholly irrelevant to the issue of whether [Chevron] has a duty to defend [the SF Plaintiffs]." *Id.* The Utah Supreme Court

> recognized the apparent inconsistency in determining that an insurer may have a duty to defend an insured although it does not have a duty to indemnify the insured. However, this result is proper where the duty to defend extend, by virtue of contract, to frivolous . . . lawsuits. This same test would be used if the insurance policy established, without defining the scope of, a duty to defend because any ambiguities would be construed in favor of the insured.

*Id.* at 561 n.4-5.

Chevron claims that under *Therkelsen* if the duty to defend language is not "expressly" broader than the indemnification language, then the court should look to extrinsic evidence to determine whether an insurer has a duty to defend. Chevron further argues that, because the duty to indemnify and defend in section 11.2.1 are "identical", then under its reading of *Therkelsen*, Chevron has no duty to defend based upon extrinsic evidence.

The SF Plaintiffs argue that under Chevron's theory, unless the insurance contract expressly covered unsuccessful claims, an insurer could wait to see if a claimant prevailed

against the insured.  If the insured prevailed against the claimant, the insurer would not have to

pay for the defense.  The SF Plaintiffs argue that this would create an incentive for an insured to

lose.  This has not been tolerated by courts because "the usual policy provisions requiring the

insurer to defend cannot be construed to impose such a duty only in the case of successful suits

against the insured."  44 Am. Jur.2d, Insurance § 1400 (2003);  *see also American Bumper and*

*Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 481 n.12 (Mich. 1996) (quoting Am. Jur.

and holding that insurer could not use successful outcome to argue that it did not have a duty to

defend);  *cf. Utah Transit Auth. v. Salt Lake City S.R.R.*, 2006 UT App. at ¶ 17 (Utah Ct. App.

2006) (holding that indemnitee is entitled to reimbursement for defense and settlement costs

even though the indemnitor eventually prevailed against the third party claimant's claim of

negligence).

The SF Plaintiffs argue, and this court agrees, that the *Therkelsen* court did not overturn

the general rule of *Sharon Steel*, and a long line of cases in all jurisdictions, that generally the

duty to defend is broader than the duty to indemnify.  The cases following *Therkelsen* have not

abandoned the general rule, nor imposed any requirement that the duty to defend language

expressly cover unsuccessful claims against the insured.  *See Rosas v. Eyre,* 82 P.2d 185, 190

(Utah Ct. App. 2003);  *Green v. State Farm Fire & Cas. Co.,* 2005 WL 3556720, *6, 2005 UT

App. 564, ¶ 33 (Utah Ct. App. 2005).  In fact, subsequent to *Therkelsen,* the Utah Supreme Court

continues to cite to the long line of Utah cases holding that:

> It is well established that "[a]n insurer's duty to defend is determined by reference
> to the allegations in the underlying complaint.  When those allegations, if proved,
> could result in liability under the policy, then the insurer has a duty to defend.
> *Nova Cas. Co. v. Able Constr.*, 983 P.2d 575 (citing *Sharon Steel Corp. v. Aetna
> Cas. & Sur. Co.*, 931 P.2d 127, 133 (Utah 1997); *Deseret Fed. Sav & Loan Ass'n*

26

*v. United States Fid. & Guar. Co.*, 714 P.2d 1143, 1146 (Utah 1986).

*Speros v. Fricke*, 98 P.3d 28, 39 (Utah 2004).  The Tenth Circuit noted, in considering some of these same cases, a duty to defend "*arises whenever the insurer ascertains facts which give rise to the potential of liability under the policy."  Western American Ins. Co. v. AV & S*, 145 F.3d 1224, 1230 (10th Cir. 1998) (emphasis in original) (quoting *Deseret Fed. Sav. & Loan Ass'n*, 714 P.2d at 1146);  *see also Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.,* 868 F. Supp. 1278, 1310 (D. Utah 1994) ("[T]he duty to defend is measured by the nature and kinds of risks covered by the policy and arises whenever the insurer ascertains facts which give rise to the potential of liability under the policy."); *Overthrust Constructors, Inc. v. Home Ins. Co.*, 676 F. Supp. 1086, 1090 (D. Utah 1987) (same).

The General Indemnity Provisions defined Chevron's duties to defend and indemnify such that both are exactly co-extensive in scope.  *See* 11/4/91, Pipeline Agreement, Section 11.2.1 (a)-(c); 11/4/1991, Plant Agreement, Section 12.2.1 (a),(b),(d).  The subsections provide that Chevron indemnify, defend and hold the SF Plaintiffs harmless against claims resulting from Chevron's pre-Closing conduct or breach of warranty.

After reviewing the record, including the preceding sections from the General Indemnity Provisions, this court finds evidence that portions of the claims filed by Ashley Creek against the SF Plaintiffs "arise or result from . . . [or are] attributed to [Chevron's] operation or ownership of the Assets or the Pipeline System prior to the Closing Date . . . ." 11/4/91, Pipeline Agreement, General Indemnity Provision, § 11.2.1.  For example, Ashley Creek's Amended Complaint alleges that Chevron failed to publish a tariff for the Pipeline.  The claim further alleges that

once Chevron published the first tariff, it was unreasonable.[13]  Both of the preceding allegations

fall squarely within the definition of pre-Closing actions and therefore, the General Indemnity

Provisions of the Sale Agreements.  The SF Plaintiffs claim that but for Chevron's pre-Closing

activities Ashley Creek would not have had reason to bring suit against them.  Based on the plain

language of the General Indemnity Provision requiring indemnification and defense of "all"

claims, "extrinsic evidence is irrelevant to a determination of whether a duty to defend exists"

and will not be admitted on behalf of either party.  *Therkelsen*, at 561.

> **c.      *Chevron's Duty to Defend Arose At Filing of Amended Complaint Bringing the SF Plaintiffs into the Ashley Creek Litigation As Defendants.***

An insurer is required to defend when it ascertains facts giving rise to potential coverage

under an insurance policy.  *See Deseret Fed. Sav. & Loan Ass'n,* 714 P.2d at 1146; *see also West*

*American Insurance Co.*, 145 F.3d at 1230.  The SF Plaintiffs argue that Chevron's obligation to

defend arose when Ashley Creek filed its Amended Complaint on April 16, 1996.  *See, e.g.,*

*Overthrust Constructors*, 676 F. Supp.  at 1091 ("Once an insurer has a duty to defend an insured

under one claim brought against the insured, the insurer must defend all claims brought at the

same time, even if some of the claims are not covered by the policy.").  Based on the language of

*Benjamin*, this court agrees.  *See Benjamin*, 2006 UT 37, at ¶15, 555 Utah Adv. Rep. 8, at *3; *see*

*also Pancakes of Hawaii*, 944 P.2d at 89.  This court finds that Chevron has a duty to defend the

SF Plaintiffs in the Ashley Creek action as of April 16, 1996, as such the SF Plaintiffs' motion

for summary judgment as to Chevron's duty to defend is GRANTED.

---

[13]The court does not reach the issue of whether or not Chevron's First Tariff was in fact
reasonable.

### 2.        Duty to Indemnify

"Like the duty to defend, '[t]he duty to indemnify is a contractual one'" and governed by

the parties' contract. *Benjamin*, 555 Utah Adv. Rep. at *5 (quoting *Therkelsen*, 27 P.3d 555).

"[A]n insured's legal liability for damages arises when judgment is entered against him." *Id.* at

*6.  All claims were dismissed against the SF Plaintiffs in the Ashley Creek Litigation.

Accordingly, Chevron has no duty to indemnify the SF Plaintiffs.  As a matter of law, the SF

Plaintiffs' motion seeking partial summary judgment on the duty to indemnity is DENIED.

## III.   Breach of Warranty Under Section 11.2.1(b)

The SF Plaintiffs claim that alleged breaches of Chevron's warranties created a duty to

defend the SF Plaintiffs in the Ashley Creek Litigation.  Ashley Creek's complaint alleged that

Chevron's tariffs were unlawful and that the SF Plaintiffs were liable for Chevron's unlawful

tariffs.

"Because [the insurer] owed a duty to defend the ... claims, [the insurer] owed a duty to

defend *all* of the claims brought by [plaintiffs]. '[W]hen there are covered and non-covered

claims in the same lawsuit, the insurer is obligated to provide a defense to the entire suit, at least

until it can limit the suit to those claims outside of the policy coverage.'" *Benjamin*, 555 Utah

Adv. Rep. at *5 (quoting Appleman on Insurance Law and Practice § 136.2[D] (2d ed.2006)

(citing *Mt. Airy Ins. Co. v. Greenbaum,* 127 F.3d 15, 19 (1st Cir. 1997) ("[I]f an insurer has a

duty to defend one count of a complaint, it must defend them all.")).  A duty to defend covers

actual breaches of warranty and claims that are based on allegations, even if ultimately

disproven, that show a breach of warranty.  *See*, *e.g. Therkelsen*, 27 P.3d at 560; *Speros*, 98 P.3d

at 38-39.

29

Chevron warranted under Section 11.2.1(b) of the Pipeline Agreement that "[e]xcept for matters set forth in Schedule 5.11, the Pipeline System is being operated in material compliance with all laws . . . rules and regulations of any court, governmental or tribal authority or arbitrator" as of the Closing Date.  11/4/1991, Pipeline Agreement, Section 5.11.  Chevron listed "none" in Schedule 5.11.  At the time of the warranty, applicable law required Chevron to publish tariffs that were "reasonable" and "not unreasonably discriminatory."  49 U.S.C. §§ 10701(a) and 10704(a).  Chevron warranted that as of November 4, 1991, that the tariffs were reasonable under Title 49.

The SF Plaintiffs claim that Ashley Creek based its pleadings and claims against the SF Plaintiffs on allegations that, if true, would constitute a breach of Chevron's warranty that it had operated the pipeline in material compliance with the law.  Ashley Creek used this alleged breach to support its claims against the SF Plaintiffs in its Second Amended Complaint.  *See* Second Amended Complaint ¶¶ 151, 166(d).  Ashley Creek relied on the allegations that the Second and Third Tariff were unreasonable and illegal to establish the "exclusionary act" necessary for all of its antitrust claims against the SF Plaintiffs.  *See id.*  Ashley Creek used Chevron's over-collections to support its allegations that the SF tariffs were unreasonable and therefore exclusionary.  Ashley Creek's allegations triggered Chevron's duty to defend.  *See Therkelsen*, 27 P.3d at 560.

The SF Plaintiffs claim that Chevron was already obligated under the Sales Agreement to pay the cost of the SF Plaintiffs' defense of claims brought by Ashley Creek because the claims were premised on Chevron's compliance or non-compliance with the Interstate Commerce Act. The SF Plaintiffs based this premise on the General Indemnity Provision.  Chevron rejected this

"obligation" based on the same provision, claiming that the parties did not expressly contract for the SF Plaintiffs' defense of any action in the Ashley Litigation Provision.  However, this court finds, as explained more fully above, that the parties did in fact contract regarding the SF Plaintiffs' defense of any and all claims and suits, including any suit brought by Ashley Creek, in the General Indemnity Provision.

Chevron claims that it did not warrant that its tariffs were lawful under the Interstate Commerce Act ("ICA").  (Ch. Br. at 41).  The court disagrees.  Had Chevron intended to exclude compliance from the ICA from its warranty, the exclusion would have been set out in Schedule 5.11.  It is not.  The Sale Agreements reflect the parties' agreement that Chevron accepted the risk of noncompliance while Chevron owned the Pipeline.  The Tenth Circuit noted "[p]arties to a contract frequently allocate risks which may arise from uncontemplated or unknown events and conditions through warranties." *Nunn v. Chemical Waste Management, Inc.*, 856 F.2d 1464, 1469 (10th Cir. 1988) (holding compliance with law can be a "fact" for which an enforceable warranty can be given).  For purposes of defense and indemnification under *Benjamin*, it is irrelevant whether Chevron's tariffs were in fact in compliance with the ICC.  What matters is what Ashley Creek alleged in the Ashley Creek Litigation.  *See, Benjamin*, 555 Utah Adv. Rep. at *5.  Because Ashley Creek alleged that the pipeline was not in compliance, and alleged it against the SF Plaintiffs, it triggered Chevron's duty to defend for breach of warranty.  *Id.*  This court finds that Chevron's duty to defend was triggered when Ashley creek alleged claims that, if correct, would be a breach of warranty under Section 11.2.1(b).  This court finds that Chevron has a duty to defend the SF Plaintiffs in the Ashley Creek Litigation based on Chevron's breach of warranty, as such the SF Plaintiffs' motion for summary judgment as to Chevron's duty to

defend is GRANTED.

**IV.  Chevron's Amended Counterclaims**

Chevron seeks summary judgment on Chevron's First and Second Amended Counterclaims, and partial summary judgment as to the Third Amended Counterclaim on the issue of liability but not damages.  The SF Plaintiffs seek summary judgment on all off Chevron's Amended Counterclaims.  The court addresses each separately.

**A.       *Chevron's First Claim for Relief - Declaratory Judgment***

Chevron seeks summary judgment on the following declaration as its first claim for relief:

> Declaring that Chevron had no obligation under either the Pipeline Sale Agreement or the Plant and Mine Sale Agreement [Plant Agreement] to have defended Simplot/Farmland [the SF Plaintiffs] in the Ashley Action [the Ashley Creek Litigation] and has no obligation to indemnify or compensate Simplot [the SF Plaintiffs] for its or Farmland's [the SF Plaintiffs'] attorneys' fees and costs incurred in the Ashley Action. . . .

Chevron's Amended Answer to Complaint and Amended Counterclaim, at 62.

Based on the foregoing reasoning, Chevron has no duty to indemnify the SF Plaintiffs because judgment was not entered against the SF Plaintiffs in the Ashley Creek Litigation.  *See Benjamin*, 555 Utah Adv. Rep. at *6 (explaining that "an insured's legal liability for damages arises when judgment is entered against him"). Chevron's request is GRANTED that it has no obligation to indemnify the SF Plaintiffs.  The remaining part of Chevron's request is DENIED.

**B.       *Chevron's Second Claim for Relief - Res Judicata, Collateral Estoppel, and/or Equitable Estoppel***

Chevron seeks summary judgment against the SF Plaintiffs on its Second Claim for relief and prays that the Complaint be dismissed in its entirety with prejudice based upon the doctrines

of res judicata, collateral estoppel and/or equitable estoppel.

Chevron claims that the SF Plaintiffs are barred from claiming that the Chevron has a duty to defend and indemnify them in the Ashley Creek Litigation based upon the essential allegations that underlie its claims for relief in the present action. Chevron claims that many of the SF Plaintiffs' claims contradict their prior representations in the Ashley Creek Litigation. In Chevron's Facts, Chevron claims that Ashley Creek brought its claims against the SF Plaintiffs because of "over-collections" under Chevron's Tariff, questions whether the STB found any tariff rates to be unreasonable, and whether the Table 9 and 10 scenarios were unreasonable under the ICA. The cited facts illustrate that the parties did indeed dispute and litigate these issues in the Ashley Creek Litigation. However, the undisputed facts do not show that the Ashley Creek Litigation addressed whether the parties litigated the issue of Chevron's duty to defend or indemnify the SF Plaintiffs, nor which party was to shoulder the substantial costs of the Ashley Creek Litigation. Although the underlying arguments that would have given rise to a duty to defend or indemnify were litigated, it does not appear the duty to defend or indemnify discussion happened with the court. Chevron certainly has not pointed the court to any facts illustrating this in the voluminous pleadings. The SF Plaintiffs have brought forth compelling evidence that the very issues of Chevron's duty to defend and indemnify were preserved for later determination in the form of the Tolling Agreement. However, based on the reasoning above, Chevron has no duty to indemnify the SF Plaintiffs because no judgment was entered against Chevron in the Ashley Creek Litigation. *See Benjamin*, 555 Utah Adv. Rep. at *6. But, in this action the SF Plaintiffs are not barred from now claiming that Chevron has a duty to defend in the Ashley Creek Litigation. Chevron's request is GRANTED in part, in that it has no obligation

to indemnify the SF Plaintiffs.  The remaining portion of Chevron's request for summary judgment on this counterclaim is DENIED.

## C.      *Chevron's Third Claim for Relief - Claim for Indemnity and Breach of Contract*

Chevron seeks summary judgment against the SF Plaintiffs on its Third Claim for relief claiming the SF Plaintiffs were obligated under the Ashley Litigation Provision to ensure compliance once tariffs were set in the ICC Action by the STB and that the SF Plaintiffs did not comply.  Chevron seeks indemnification from the SF Plaintiffs based on this claimed breach of contract.

As discussed above, the Ashley Litigation Provision's language is clear on its face.  It simply required the SF Plaintiffs to "assume the responsibility and cost of prospective compliance with the tariff when set in the ICC Case and any mandatory prospective compliance when granted in either case."  11/4/91, Pipeline Agreement, § 2.6.1.

Chevron argues that under Section 2.6.1 the SF Plaintiffs were obligated to do several things, including post a tariff low enough to make all of the tariffs reasonable.  Chevron claims that if the SF Plaintiffs failed to do so, under the General Indemnity Provision the SF Plaintiffs must indemnify Chevron for any loss it incurs, including attorneys' fees and costs, resulting from a breach of any of their obligations, representation or warranties attributable to the ownership or operation of the Pipeline or Plant after the Closing-date.  Chevron claims that the SF Plaintiffs breached Section 2.6.1 by delaying in publishing a tariff until 1999.  This court does not agree with Chevron's interpretation of Section 2.6.1.  The plain language Section 2.6.1 only requires the SF Plaintiffs to assume Chevron's costs once a tariff has been set in the ICC case, and one was never set.  Under the plain language of Section 2.6.1, the SF Plaintiffs did not promise to

ensure compliance with the STB Decision's framework, as Chevron contends.

Based on the reasoning above, the SF Plaintiffs have no duty to indemnify Chevron because no judgment was entered against the Chevron in the Ashley Creek Litigation.  *See Benjamin*, 555 Utah Adv. Rep. at *6 (explaining that "an insured's legal liability for damages arises when judgment is entered against him"). Chevron's request is DENIED.

**D.      *Chevron's Fourth Claim for Relief -Alternative Claim for Indemnity and Breach of Contract***

The SF Plaintiffs seek summary judgment on Chevron's Fourth Claim for Relief. Chevron has not moved for summary judgment on this claim.  Chevron claims, in the alternative, that if Chevron could have determined that the Third Tariff was unreasonable at the time it made its Section 5.11 Warranty, the SF Plaintiffs could have too.  Chevron argues that the SF Plaintiffs, as the new owners of the Pipeline, were obligated to determine and set reasonable tariffs under the ICA, as of the Closing Date, April 17, 1992.  Chevron argues that this obligation was not discharged by Chevron's Section 5.11, Warranty that Chevron's operation of the pipeline was in material compliance with the law.  Chevron claims that the SF Plaintiffs' delay in publishing the Fourth Tariff excused or discharged Chevron's duty to defend the SF Plaintiffs and entitles Chevron to attorneys' fees and costs under the General Indemnity Provision.

The SF Plaintiffs claim that the plain language Section 2.6.1 only requires the SF Plaintiffs to assume Chevron's costs once a tariff has been set in the ICC case, and one was never set.  The SF Plaintiffs argue that they did not agree to ensure the tariffs would be "reasonable" in Section 2.6.1, however, even if they had, the district court in the Ashley Creek Litigation concluded if "each tariff is analyzed for its own reasonableness . . . both the third and

the fourth tariffs were reasonable while they were in effect." *Ashley Creek Phosphates,* 129 F. Supp. 2d at 1309.  Thus, the SF Plaintiffs argue they could not have breached a contractual provision promising "reasonablity" of tariffs.

The SF Plaintiffs argue that under the plain language of Section 2.6.1, they did not promise to ensure compliance with the STB Decision's framework, as Chevron contends.  This court agrees.  Under Utah law, Chevron cannot use the covenant of good faith and fair dealing to add an obligation to the contract to which the SF Plaintiffs did not agree. *See Oakwood Village, LLC v. Albertsons Inc.*, 104 P.3d 1226, 1240 (Utah 2004).  Therefore, the SF Plaintiffs' request for summary judgment on Chevron's fourth claim is GRANTED.

## CONCLUSION

Based on the above reasoning, IT IS HEREBY ORDERED that the SF Plaintiffs' Partial Motion for Summary Judgment is GRANTED in part and DENIED in part as outlined above; the SF's Motion for Summary Judgment on Chevron's Counterclaims is GRANTED in part and DENIED in part as outlined above; and Chevron's Motion for Summary Judgment is GRANTED in part and DENIED in part as outlined above.  The issue of reasonableness and amount of fees and costs will be resolved at a future date.

DATED this 27th day of September, 2006.

BY THE COURT:

DALE A. KIMBALL
United States District Judge